UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

JASON G. OHNEMUS, BROOK S. PAYNE, indi-
vidually, and as representatives of a Class of Partici-
pants and Beneficiaries of the Telephone and Data
Systems, Inc. Tax Deferred Savings Plan,

Plaintiffs,

v.

TELEPHONE AND DATA SYSTEMS, INC.

and

BOARD OF DIRECTORS OF TELEPHONE AND
DATA SYSTEMS, INC.,

Civil Action No. 4:24-cv-81

CLASS ACTION
COMPLAINT PURSUANT
TO 29 U.S.C. § 1132(a)(2)

COMES NOW Plaintiffs, Jason G. Ohnemus and Brook S. Payne  ("Plaintiffs"), individually and

as representatives of a Class of Participants and Beneficiaries of the Telephone and Data Systems, Inc.

Tax Deferred Savings Plan (the "Plan" or "TDS Plan"), by their counsel, WALCHESKE & LUZI,

LLC, and NEWKIRK ZWAGERMAN, P.L.C., as and for a claim against Defendants, alleges and as-

serts to the best of their knowledge, information, and belief, formed after an inquiry reasonable under

the circumstances, the following:

## INTRODUCTION

1.      As the Eighth Circuit has observed, "ERISA's fiduciary duties. . . have been described

as the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

2.      Defendants, Telephone and Data Systems, Inc. ("TDS") and the Board of Directors

of Telephone and Data Systems, Inc. ("Board"), are fiduciaries under the Employee Retirement In-

come Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.,* as they exercise discretionary authority or

1

discretionary control over the 401(k) defined contribution retirement plan – known as the Telephone and Data Systems, Inc. Tax Deferred Savings Plan (the "Plan" or "TDS Plan") – that it sponsors and provides to its employees.

3.      During the putative Class Period (February 28, 2018, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping [and administrative (RKA)] fees," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739-740 (2022), and by failing to remove their high-cost recordkeeper, Alight Solutions/Aon Consulting ("Alight").[1]

4.      Plaintiffs are "participants" of the Plan under ERISA Section 3(7), 29 U.S.C. § 1002(7).

5.      The Plan is a Section 401(k) "defined contribution" retirement plan under 29 U.S.C. § 1002(34), meaning that TDS' contributions to the payment of Plan costs is guaranteed but the retirement benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, *less expenses*." *Tibble v. Edison Int'l,* 575 U.S. 523, 525 (2015) (emphasis added.)

6.      TDS and its Board are both the Plan Sponsor and Plan Administrator of the Plan.

7.      Plaintiffs allege two ERISA violations against Defendants: a violation of the duty of prudence against Defendants under 29 U.S.C. § 1104(a)(1)(B) for charging Plan participants excessive Bundled RKA fees, and a claim against Defendants for failure to monitor fiduciaries responsible for Plan administration with regard to Plan Bundled RKA fees.

8.      More specifically, Count I alleges a breach of the fiduciary duty of prudence by Defendants for incurring unreasonable Bundled RKA fees. Among other things, Defendants *paid over a*

_____

[1] Based on Form 5500s dating back to 2009, Alight/Aon Consulting has been the recordkeeper of the Plan for at least fifteen years (although previously known as Hewitt Associates).

*115% premium* per-participant for Bundled RKA fees for the Plan to the Plan recordkeeper, Alight, during the Class Period.

9.      Defendants should have lowered its Bundled RKA fees by soliciting bids from competing providers and using its massive size and correspondent bargaining power to negotiate for fee rebates, but it did not do so, or did so ineffectively, during the Class Period.

10.      Counts II alleges a breach of fiduciary duty by Defendants for failing to monitor those individuals responsible for paying these unreasonable Bundled RKA fees.

11.      Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

12.      The Supreme Court has stated that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble*, 575 U.S. at 529. This continuing duty to monitor is a subset of the duty of prudence, *Tibble*, 575 U.S. at 529–30, and requires a plan fiduciary to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *See Hughes v. Northwestern University*, 63 F.4th 615, 626 (7th Cir. 2023) ("*Hughes II*"); *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020) (discussing a fiduciary's duty to keep plan expenses under control).

13.      Plan fiduciaries have a continuing duty to monitor their RKA fees to make sure that they are not excessive with respect to the services received.

14.      Although "a fiduciary need not constantly solicit quotes for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees

3

and fail to take action to mitigate excessive fees—such as by adjusting fee arrangements, soliciting bids, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence." *Hughes II*, 63 F.4th at 625-626.

15.     ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating Bundled RKA fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

16.     There is no requirement to allege the actual inappropriate fiduciary actions taken because "[i]t would be perverse to require plaintiffs bringing [ERISA] claims to plead facts that remain in the sole control of the parties who stand accused of wrongdoing." *See Braden*, 588 F.3d at 602.

17.     The unreasonable Bundled RKA fees paid inferentially and plausibly establishes that an adequate investigation would have revealed to a reasonable fiduciary that the Plan Bundled RKA services, given their level and quality, were improvident.  The facts alleged below show that a prudent fiduciary would have taken steps to reduce these Plan fees. *See Hughes II*, 63 F.4th at 628.

18.     There is no "obvious alternative explanation that suggests [that Defendants'] conduct falls within the range of reasonable judgments a fiduciary may make based on [their] experience and expertise." *Id.* at 635.  Defendants' fiduciary decisions fall outside the range of reasonableness.  *Id.* at 630, 633.

19.     These breaches of fiduciary duty caused Plaintiffs and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees.

20.     To remedy these fiduciary breaches, Plaintiffs bring this action in a representative capacity on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. §

1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought

under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

22.     This Court has personal jurisdiction over Defendants because they transact business

in this District, reside in this District, and have significant contacts with this District, and because

ERISA provides for nationwide service of process.

23.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) be-

cause some or all of the violations of ERISA occurred in this District and Defendants reside and may

be found in this District.

24.     In conformity with 29 U.S.C. §1132(h), Plaintiff served this Complaint by certified

mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

25.     Plaintiff, Jason G. Ohnemus, is a resident of the State of Iowa and currently resides

in Indianola, Iowa, and during the Class Period, he was a participant in the Plan under ERISA § 3(7),

29 U.S.C. § 1002(7).

26.     Plaintiff Ohnemus has been a U.S. Cellular store manager in Knoxville, Iowa, since

April 2014. He is a current employee of TDS.

27.     During the Class Period, Plaintiff Ohnemus invested in the following funds: Vanguard

Retirement Income Fund, Vanguard Retirement 2015 through 2055 Funds, U.S. Cellular Common

Stock Fund,  TDS Common Stock Fund, Vanguard Int'l Index Fund, Vanguard Small Cap Growth

Index Fund, Vanguard Small Cap Value Index Fund, Vanguard Growth Index Fund, Vanguard Value

Index Fund, Vanguard Institutional Index Fund, Blackrock Bond Index Fund, and Vanguard Savings

Trust II Fund. Plaintiff Ohnemus is still currently enrolled in the Plan.

28.     Plaintiff, Brook S. Payne, is a resident of the State of Tennessee and currently resides in Knoxville, Tennessee, and during the Class Period, she was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

29.     Plaintiff Payne was an administrative assistant in a TDS faculty from 2006 until April 2023 in Knoxville, Tennessee.

30.     During the Class Period, Plaintiff Payne was invested in: U.S. Cellular Common Stock Fund,  TDS Common Stock Fund, Vanguard Int'l Index Fund, Vanguard Small Cap Growth Index Fund, Vanguard Small Cap Value Index Fund, Vanguard Growth Index Fund, Vanguard Value Index Fund, Vanguard Institutional Index Fund, Blackrock Bond Index Fund, and Vanguard Savings Trust II Fund.. Plaintiff Payne rolled out of the Plan in June 2023.

31.     Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries to their Plan accounts through paying excessive Bundled RKA fees during the Class Period. Those injuries are fairly traceable to Defendants' unlawful conduct in maintaining Alight as its recordkeeper, and that harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiffs and Class.

32.     Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond their own injuries.

33.     The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive Bundled RKA fees) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

34.     Having never managed a massive 401(k) Plan, Plaintiffs, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

35.     Telephone and Data Systems, Inc. ("TDS") is a Chicago-based telecommunications service company providing wireless products and services; cable and wireline broadband, TV and voice services; and hosted and managed services to approximately 6 million customers nationwide through its business units TDS Telecom and U.S. Cellular and OneNeck IT Solutions. TDS' headquarters are located at 30 North LaSalle, Chicago, Illinois 60602. In this Complaint, "TDS" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain, including U.S. Cellular.

36.     TDS acted through its officers, including its Board of Directors, to perform Plan-related fiduciary functions in the course and scope of their business. TDS and its Board appointed other Plan fiduciaries to administer and manage the Plan and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, TDS and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

37.     The Plan is also administered by Defendants. As the Plan Administrators, Defendants are fiduciaries with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). Defendants have the authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

38.     In 2022, the Plan had $1,351,040,580 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had more bargaining power regarding Plan fees and expenses than almost any other 401(k) plans in the United States. Defendants, however, did not regularly monitor Alight to ensure that Alight remained the prudent and objectively reasonable choices to provide Bundled RKA services, as illustrated by not reducing its Bundled RKA fees sufficiently.

39.     With 14,800 participants in 2022, the Plan had more participants than 99.90% of the defined contribution plans in the United States that filed 5500 forms for the 2022 Plan year. Similarly,

with $1,351,040,580 in assets in 2022, the Plan had more assets than 99.89% of the defined contribution plans in the United States that filed 5500 forms for the 2022 Plan year.

## RECORDKEEPING AND ADMINISTRATION ("RKA") SERVICES AND FEES

40.     Employers must: (1) establish a prudent process for selecting service providers; (2) ensure that fees paid to service providers are reasonable in light of the level and quality of services provided; and (3) monitor service providers once selected to make sure they continue to be prudent choices.

41.     Defined contribution plan fiduciaries of 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of massive retirement plans with a prudent and materially similar level and caliber of services. Alight is one such recordkeeper.

42.     There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to defined contribution plans like the TDS Plan.

43.     All else being equal, the more participants a plan has, a recordkeeper will be able to provide a lower fee per participant to provide materially similar RKA services to maintain the same profit margin rate.

44.     There are three types of RKA services provided by all recordkeepers.

45.     The first type, "Bundled RKA," include:

   a.     Recordkeeping;

   b.     Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

   c.     Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

      d.      Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

      e.      Maintenance of an employer stock fund;

      f.      Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

      g.      Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

      h.      Compliance testing to ensure the plan complies with Internal Revenue non-discrimination rules; and

      i.      Trustee/custodian services.

46.     According to the TDS Plan Audited Financials of December 31, 2022, "[c]ertain administrative, recordkeeping and trustee fees, as well as investment option expenses, are paid by Plan participants. Legal, auditing and investment consulting fees are paid by TDS. Plan participants also pay participant-initiated transaction fees (such as distribution, withdrawal, loan and Qualified Domestic Relations Order fees)."

47.     There is nothing in these Financials to suggest that there is anything exceptional, unusual, or customized about the Bundled RKA services provided to TDS Plan participants by Alight.

48.     The Plan provided participants all the commoditized and fungible Bundled RKA services provided to all other massive 401(k) plan participants. The quality or type of RKA services provided by competitor recordkeepers are comparable to that provided by Alight. Any differences in these Bundled RKA services are immaterial to the price quoted by recordkeepers for such services.

49.     Given the fungibility and commoditization of these Bundled RKA services for massive plans like the TDS Plan, failing to adjust fee arrangements, solicit bids, or negotiate for rebates with

existing recordkeepers, all violate a fiduciary's duty of prudence under ERISA. *See Hughes II*, 63 F.4th at 625-626.

50.     Based on Plan 5500 Forms between 2018 and 2022, Alight in fact charged Plaintiffs and Class Members about $77 annually on average per year deducted quarterly per participant for Bundled RKA.

51.     Since well before 2018, industry experts have maintained that for massive retirement plans like the TDS Plan, prudent fiduciaries treat Bundled RKA services as a commodity with little variation in price.

52.     "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

53.     Because RKA services are commoditized, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for massive plans like the TDS Plan.

54.     RKA services are essentially fungible and the market for them is highly competitive. This highly competitive RKA market is filled with equally capable recordkeepers, similar to Alight, who can provide comparable Bundled RKA services for less if only asked to provide bids to plans like the TDS Plan.

55.     Given the mammoth size of the TDS Plan, the same price paid by the TDS Plan for Bundled RKA over the Class Period, and the trend of price compression for Bundled RKA over the last six years, Plaintiffs can infer that Defendants did not engage in any competitive solicitation of RKA bids, or only ineffective ones, breaching ther fiduciary duties of prudence.

56.     The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants. These "A La Carte RKA" services typically include the following:

      a.      Loan processing;

      b.      Brokerage services/account maintenance;

      c.      Distribution services; and

      d.      Processing of Qualified Domestic Relations Orders (QDROs).

57.     According to the TDS Audited Financial  Dated December 31, 2022, the Plan provided all these individual usage services to participants for various fees.

58.     The third type of RKA fees are Ad Hoc fees which are transaction fees and other administrative fees, and include such things as ESOP fees, fees for service, and terminated maintenance fees.

59.     According to the TDS Audited Financial Dated December 31, 2022, either no such fees were paid by the Plan or were improperly not disclosed.

60.     Bundled RKA fee numbers represent the best methodology for determining apples-to-apples comparisons of  plans as far as what is being charged for Bundled RKA services.

61.     The methodology utilized in this Complaint for calculating the Bundled RKA for both the TDS Plan and for all the comparison plans discussed below contains the following seven steps:

      a.      taking the direct compensation paid to each plan's recordkeeper directly from Schedule C of Form 5500;

      b.      reviewing the investments held by the plan listed in the supplemental schedule to Form 5500, Schedule H, Part IV, Line 4(i) – Schedule of Assets;

c.   reviewing Schedule C, Part I, Line 3 for revenue sharing earned by investments in the plan;

d.   Cross-referencing publicly available revenue sharing rates for investment options by recordkeeping platform and custody and trading partners to determine whether each investment option contains any revenue sharing and, if so, what the appropriate revenue sharing rate is for each investment option in the plan;

e.   utilizing the year-end assets for each investment option from Form 5500, Schedule H, Part IV, Line 4(i) and multiply it by the appropriate revenue sharing rate to determine the amount of indirect compensation earned by the recordkeeper;

f.    reviewing the notes of the Audited Financial Statement attachment to Form 5500. In many cases, the notes to the Audited Financial Statement provide additional information that can determine each plan's pricing structure and whether revenue sharing was allocated back to the plan and/or Plan Participants and, if so, how much; and

g.   reviewing the results for reasonableness and make revisions as appropriate based on Plaintiffs' non-testifying experts' experience in evaluating plans with(?) the different recordkeepers.

62.    Because the Bundled RKA offerings are fungible among all recordkeepers who provide services to massive plans, like the TDS plan, it is the standard and prevailing practice for retirement plan consultants and advisors to request quotes by asking what the recordkeeper's "revenue requirement" is on a per participant basis for providing the Bundled RKA services.

63.    This approach is validated by the structure of the request for proposals (RFPs) sent out by retirement plan consultants and advisors and the responses provided by the recordkeepers and then the summary of the evaluations created by the retirement plan consultants and advisors.

64.     Fidelity, the largest 401k recordkeeper in the country, has in fact conceded that the Bundled RKA services that it provides to other massive plans are commodified, including the plan services provided to its own employees.

65.     As part of stipulated facts in a previous case, Fidelity stated: "The value of the record-keeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity it could have obtained recordkeeping services for these amounts during these periods. *The Plan did not receive any broader or more valuable record-keeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present)*." *See Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

66.     The investment options selected by plan fiduciaries often have a portion of the Bun-dled expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

67.     Recordkeepers often collect a portion of the Bundled expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

68.     According to the Plan 5500 Forms, the TDS Plan paid both direct and indirect RKA fees during the Class Period to Alight and other Plan service providers.

**ERISA Fiduciary Standards For Selecting and Monitoring Recordkeepers**

69.     Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive

bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan. *See, e.g.,* U.S. DEPARTMENT OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 6, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Oct. 10, 2022) ("Give all of them complete and identical information about your plan and the features you want so that you can make a meaningful comparison. This information should include the number of plan participants and the amount of plan assets as of a specified date.")

70.     Prudent plan fiduciaries can easily receive a quote from other recordkeepers to determine if their current level of Bundled RKA fees is reasonable in light of the level and quality of recordkeeper fees. It is not a cumbersome or expensive process.

71.     It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees | Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable.").

72.     Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide a materially similar level and qualities of services for a more competitive reasonable fee if necessary.  Plan fiduciaries treat RKA services as a commodity or fungible when negotiating RKA fees.

73.   An internal benchmarking survey from CapTrust, Fiduciary Decisions/Benchmarks, or similar company, is inadequate to determine a reasonable Bundled RKA fee. Such benchmarking surveys skew to higher "average prices," that favor inflated Bundled RKA fees. To receive a "reasonable" Bundled RKA fee in the prevailing market, investment consultants routinely advise plan fiduciaries to engage in solicitations of competitive RKA bids on a periodic basis of every three to five years.

74.   Prudent fiduciaries implement three related processes to prudently manage and control a plan's RKA fees. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

75.   First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

76.   Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

77.   Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

78.   Accordingly, the best way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of RKA services is to obtain competitive bids from other providers in the market. *Hughes II*, 63 F.4th at 625-626.

**THE PLAN PAID UNREASONABLE BUNDLED RKA FEES
TO ALIGHT DURING THE CLASS PERIOD**

79.    A plan fiduciary must continuously monitor its Bundled RKA fees by regularly conducting an independent evaluation of those fees to ensure they are reasonable and remove recordkeepers if those fees become unreasonable. *See Hughes*, 142 S. Ct. at 742.

80.    During the Class Period, Defendants egregiously failed to monitor the Plan's Bundled RK&A fees paid to Alight.

81.    During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Alight, in order to avoid paying unreasonable Bundled RKA fees.

82.    During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable Bundled RKA fees it paid to Alight and in light of the level and quality of Bundled RKA services it received that were materially similar to services available through other recordkeepers and provided to other massive plans.

83.    As set forth in the table below, from the years 2018 through 2022, based upon information provided in 5500 Forms filed with the DOL and Participant Fee Disclosures, the Plan paid an effective average annual Bundled RKA fee of $77 annually per participant, while a reasonable rate for materially similar Bundled RKA services for a plan the size of TDS should have been $36 annually per participant.

### Bundled Recordkeeping and Administration (Bundled RKA) Fees

| | 2018 | 2019 | 2020 | 2021 | 2022 | *Average* |
|---|---|---|---|---|---|---|
| Participants | 13,459 | 13,709 | 13,284 | 13,715 | 14,800 | *13,793* |
| Est. Bundled RKA Fees | $1,130,556 | $1,151,556 | $1,036,152 | $987,480 | $1,021,200 | *$1,065,389* |
| Est. Bundled RKA Per Participant | $84 | $84 | $78 | $72 | $69 | *$77* |
| Reliable Est. of Reasonable Bundled RKA Fees | $484,524 | $493,524 | $478,224 | $493,740 | $532,800 | *$496,562* |
| Reliable Est. of Reasonable Bundled RKA Fees Per PP | $36 | $36 | $36 | $36 | $36 | *$36* |

84.     The table below illustrates the annual Bundled RKA fees paid by other comparable plans of similar size, receiving a materially similar level and quality of Bundled RKA services in 2021.

**Comparable Plans' Bundled 2021 RKA Fees Based on Publicly Available Information from Participant Fee Disclosures or Financial Statements**

| Plan | Partici-pants | Bundled RKA Fee ($) | Bundled RKA Fee ($/pp) | Recordkeeper |
|------|------|------|------|------|
| Cornerstone Building Brands 401(K) Profit Sharing Plan | 9,384 | $403,512 | $43 | Fidelity |
| Consumers Energy Company Employees' Savings Plan | 11,320 | $475,440 | $42 | Fidelity |
| Roper Technologies, Inc. Employees' Retirement Savings 004 Plan | 13,394 | $495,578 | $37 | Vanguard |
| **TDS Plan 2021 Fee** | **13,715** | **$987,480** | **$72** | **Aon Consulting (Alight)** |
| Phillips 66 Savings Plan | 15,986 | $559,510 | $35 | Vanguard |
| Dollar General Corp 401(K) Savings and Retirement Plan | 16,125 | $516,000 | $32 | Voya |
| Assurant 401(K) Plan | 16,830 | $572,220 | $34 | Vanguard |
| Team Health 401(k) | 17,237 | $430,925 | $25 | Schwab |

85.     To determine the Bundled RKA fees that other comparable plans are paying, Plaintiffs considered both the direct and indirect compensation collected by recordkeepers as disclosed on publicly available Form 5500s and on Participant Fee Disclosures.

86.     To provide evidence that the Plan paid unreasonable and excessive fees for Bundled RKA services, the Plaintiffs considered the Bundled RKA fee rates set forth in participant fee disclosures of other comparable plans when that information was available.

87.     The evidence of the Bundled RKA fee rates paid by these comparable plans provides evidence that the Bundled RKA fees paid by the TDS Plan were excessive and unreasonable and leads to an inference that the Plan fiduciaries employed an imprudent process.

88.     Plaintiffs do not definitively contend that the fiduciaries of these comparable plans followed a prudent process. Rather, the Bundled RKA fee rates paid by each of these comparable

plans provides evidence that the Plan paid excessive fees because there are no RKA services offered by any recordkeeper that would warrant or reasonably explain the disparity between the effective Bundled RKA fee rate paid by the Plan and the Bundled RKA fee rate that other comparable plans received for the materially similar Bundled RKA services during the Class Period.

89.     For example, as set forth in the Plan's January 14, 2020 Participant Account Statement, Plaintiff Ohnemus was charged a quarterly "Administrative Expense" rate of $21 for the period October 1, 2019 through December 31, 2019.

90.     Under the Plan's fee structure, the Plan paid an annual Bundled RKA fee rate of $84/pp in 2019. That is calculated using the Plan's quarterly participant fee rate of $21 multiplied by four.

91.     The Plan's Bundled RKA fee rate of $84/pp, as well as the Bundled RKA fee rate for other years within the Class Period, can then be compared to the Bundled RKA fee rate of other comparable plans.

92.     That being said, the market for RKA services is not transparent.  In most cases the Participant Fee Disclosure documents are not publicly available and are not published by recordkeepers.  Plaintiffs do not have the ability to obtain the participant fee disclosure documents for all plans that have a range of participants similar to the Plan.

93.     The following paragraph outline the Bundled RKA fees reported by the comparator plans for the same all-encompassing recordkeeping and administrative services provided by all massive plans like the TDS Plan.

94.     **Cornerstone Building Brands 401(k) Profit Sharing Plan** ("Cornerstone"): The comparable fee rate of $43/pp is taken directly from the "Administrative Expenses" section of the Financial Statement attached to the 2021 Form 5500.  The section indicates "The annual plan recordkeeping fee of $43 per participant is paid by Plan participants via an automatic quarterly deduction…"

95.     The Cornerstone plan is a meaningful benchmark because at the end of 2021 the Cornerstone plan had over 9,384 participants, slightly less than the 13,715 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Cornerstone plan and the Plan, and any service differentials cannot explain the disparity between the fees paid by the Cornerstone plan and the fees paid by the Plan.

96.     There are no special or different RKA services provided to any plan with between around 9,000 and 14,000 participants that would reasonably warrant incremental additional fees of over $390,000 for plans with similar numbers of participants.

97.     Therefore, all else being equal, if the Cornerstone plan can obtain a fee of $43/pp with 9,384 participants, then the Plan, with 13,715 participants at the end of 2021, should be able to obtain a fee of around $43/pp, *or lower*, as indicated by the trend line generated from the Bundled RKA Fee Rates paid by all the comparable plans.

98.     The fact that the Plan had around 4,400 more participants than the Cornerstone plan does not make the Cornerstone plan a meaningless comparable plan. On the contrary, in terms of the number of participants and in relation to the Plan, the Cornerstone plan is one of the closest 0.1% (one tenth of 1%) of all defined contribution plans governed by ERISA. The massive disparity between the Bundled RKA fees paid by the Cornerstone plan and the Plan's actual effective Bundled RKA fee rate of around $72/pp, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a likely reasonable inference that the Plan paid excessive and unreasonable RKA fees, and the Plan's process was not prudent.

99.     **Consumers Energy Company Employees' Savings Plan** ("Consumers Energy"): The comparable fee rate of $42/pp is taken directly from the "Plan Administrative Fees and Expenses" section of the February 14, 2022 Employees' Savings Plan of Consumers Energy Company participant fee disclosure document describing "$42.00 per year deducted quarterly." The fee disclosure document goes on to state "[p]lan administrative fees may include recordkeeping, legal, accounting, trustee, and other administrative fees and expenses associated with maintaining the plan."

100.    The Consumers Energy plan is a meaningful benchmark because in 2021 it had 11,320 participants, which is slightly less (within 18%) than the 13,715 participants the Plan had at the end of 2021. The costs to a recordkeeper for providing RKA services to a plan with more than around 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Consumers Energy plan and the Plan, and any service differentials cannot explain the disparity between the fees paid by the Consumers Energy plan and the fees actually paid by the Plan.

101.    For example, the disparity of $30/pp between the Bundled RKA rate of $72/pp paid by the Plan compared to $42/pp bundled RKA rate of the Consumers Energy plan's fee represents around $410,000 annually and would conservatively represent around 8,200 hours of RKA services in one year provided by employees of the recordkeeper.

102.    There are no special or different RKA services provided to any plan with between 11,000 and 14,000 participants that would reasonably warrant incremental additional fees of around $410,000. As a result, the primary driver of the fee that recordkeepers would initially bid to provide RKA services is driven primarily by the number of participants in the plan.

103.    The fact that the Plan has less than 2,400 more participants than the Consumers Energy plan does not make the Consumers Energy plan a meaningless comparable plan. On the contrary,

in terms of the number of participants and in relation to the Plan, the Consumers Energy plan is one of the closest 0.1% of all defined contribution plans governed by ERISA.

104.     As described above, all else being equal, if the Consumers Energy plan can obtain a fee of $42 per participant with 11,320 participants, then the Plan, with 13,715 participants at the end of 2021, should be able to obtain a fee of around $42/pp, *or lower*, as indicated by the trend line generated from the Bundled RKA Fee Rates paid by all the comparable plans. Accordingly, the massive disparity between the Bundled RKA fees paid by the Consumers Energy plan of $42/pp and the Plan's actual effective Bundled RKA fee rate of around $72/pp, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a likely reasonable inference that the Plan paid excessive and unreasonable RKA fees and the Plan's process was not prudent.

105.     **Roper Technologies, Inc. Employees' Retirement Savings 004 Plan** ("Roper"): The comparable fee rate of $37/pp is taken directly from the "Plan Administrative Expenses" section of the June 2, 2022 Roper Technologies, Inc. Employees' Retirement Savings 004 Plan participant fee disclosure document describing "An annual plan recordkeeping fee of $37 is charged to each plan participant."

106.     The Roper plan is a meaningful benchmark because at the end of 2021 it had 13,394 participants, which is slightly less (within 3%) than the 13,715 participants in the Plan had at the end of 2021. The costs to a recordkeeper for providing RKA services to a plan with more than around 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Roper plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Roper plan and the fees actually paid by the Plan.

107.     For example, the disparity of $35/pp between the Bundled RKA rate of $72/pp paid by the Plan compared to $37/pp bundled RKA rate of the Roper plan's fee represents around

$480,000 annually and would conservatively represent around 9,600 hours of RKA services in one year provided by employees of the recordkeeper. There are no special or different RKA services provided to any plan with between, e.g., 13,000 and 14,000 participants, that would reasonably warrant incremental additional fees of around $480,000. As a result, the primary driver of the fee that record-keepers would initially bid to provide RKA services is driven primarily by the number of participants in the plan.

108.    The fact that the Plan had 321 more participants than the Roper plan does not make the Roper plan a meaningless comparable plan. In fact, the Roper plan is one of the most similar plans that could possibly be provided as a comparable plan.  Specifically, the Roper plan is a meaningful comparable plan because, in terms of the number of participants and in relation to the Plan, the Roper plan is one of the closest 0.1% of all defined contribution plans governed by ERISA. Accordingly, the massive disparity between the Bundled RKA fees paid by the Roper plan's Bundled RKA fee rate of $37/pp and the Plan's actual effective Bundled RKA fee rate of around $72/pp, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a reasonable inference that the Plan paid excessive and unreasonable RKA fees and the Plan's process was not prudent.

109.    **Phillips 66 Savings Plan** ("Phillips"): The comparable fee rate of $35/pp is taken directly from the "Plan Administrative Expenses" section of the June 2, 2022 Phillips 66 Savings Plan participant fee disclosure document describing "An annual plan recordkeeping fee of $35 is charged to each plan participant."

110.    The Phillips plan is a meaningful benchmark because at the end of 2021 it had 15,986 participants, which is slightly more (within 17%) than the 13,715 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than around 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services

22

provided to plans as large as both the Phillips plan and the Plan, and any service differentials cannot explain the disparity between the fee rates paid by the Phillips plan and the fees actually paid by the Plan. There are no material differences in the RKA services provided to plans as large as both the Phillips plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Phillips plan and the fees actually paid by the Plan.

111.    For example, the disparity of $37/pp between the Bundled RKA rate of $72/pp paid by the Plan compared to the $35/pp bundled RKA rate of the Phillips plan's fee represents around $500,000 annually and would conservatively represent around 10,000 hours of RKA services in one year provided by employees of the recordkeeper. There are no special or different RKA services provided to any plan with between, e.g., 13,000 and 16,000 participants, that would reasonably warrant incremental additional fees of around $500,000.

112.    The fact that the Plan has slightly fewer participants than the Phillips plan does not make the Phillips plan a meaningless comparable plan. In fact, the Phillips plan is a meaningful comparable plan because, in terms of the number of participants and in relation to the Plan, the Phillips plan is one of the closest 0.1% of all defined contribution plans governed by ERISA. Plaintiffs do not contend that the Plan should have necessarily been able to obtain a fee as low as the Phillips plan. Rather, the massive disparity between the Bundled RKA fees paid by the Phillips plan and the Plan's actual Bundled RKA fee rate of around $72/pp, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a reasonable inference that the Plan paid excessive and unreasonable RKA fees and the Plan's process was not prudent.

113.    **Dollar General Corp 401(k) Savings and Retirement Plan** ("Dollar General"): The comparable fee rate of $32/pp is taken directly from the "Administrative Expenses" section of the Financial Statement attached to the 2017 Form 5500.  The section indicates "Participants are charged a flat fee of $32 per year for administrative and recordkeeping services…."

114.    The Dollar General plan is a meaningful benchmark because at the end of 2017 it had

16,125 participants, which is slightly more (within 18%) than the 13,715 participants in the Plan. The

costs to a recordkeeper for providing RKA services to a plan with more than around 3,000 participants

are driven primarily by the number of participants. There are no material differences in the RKA

services provided to plans as large as both the Dollar General plan and the Plan, and any service

differentials cannot explain the disparity between the fee rates paid by the Dollar General plan and

the fees actually paid by the Plan. There are no material differences in the RKA services provided to

plans as large as both the Dollar General plan and the Plan and any service differentials cannot explain

the disparity between the fees paid by the Dollar General plan and the fees actually paid by the Plan.

115.    For example, the disparity of $40/pp between the Bundled RKA rate of $72/pp paid

by the Plan compared to $32/pp bundled RKA rate of the Dollar General plan's fee represents around

$540,000 annually and would conservatively represent around 10,800 hours of RKA services in one

year provided by employees of the recordkeeper.  There are no special or different RKA services

provided to any plan with between, e.g., 13,000 and just over 16,000 participants, that would reason-

ably warrant incremental additional fees of around $540,000.

116.    The fact that the Plan has slightly fewer participants than the Dollar General plan does

not make the Dollar General plan a meaningless comparable plan. In fact, the Dollar General plan is

a meaningful comparable plan because, in terms of the number of participants and in relation to the

Plan, the Dollar General plan is one of the closest 0.1% of all defined contribution plans governed by

ERISA. Plaintiffs do not contend the Plan should have necessarily been able to obtain a fee as low as

the Dollar General plan. Rather, the massive disparity between the Bundled RKA fees paid by the

Dollar General plan and the Plan's actual Bundled RKA fee rate of around $72/pp, viewed holistically

and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a

reasonable inference that the Plan paid excessive and unreasonable RKA fees and the Plan's process was not prudent.

117.    **Assurant 401(k) Plan** ("Assurant"): The comparable fee rate of $34/pp is taken directly from the "Plan Administrative Expenses" section of the June 1, 2022 Assurant 401(k) Plan participant fee disclosure document describing "An annual plan recordkeeping fee of $34 is charged to each plan participant with an account balance of $100 or more."

118.    The Assurant plan is a meaningful benchmark because at the end of 2021 it had 16,830 participants, which is slightly more (within 23%) than the 13,715 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than around 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Assurant plan and the Plan, and any service differentials cannot explain the disparity between the fee rates paid by the Assurant plan and the fees actually paid by the Plan. There are no material differences in the RKA services provided to plans as large as both the Assurant plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Assurant plan and the fees actually paid by the Plan.

119.    For example, the disparity of $38/pp between the Bundled RKA rate of $72/pp paid by the Plan compared to $34/pp bundled RKA rate of the Assurant plan represents around $520,000 annually and would conservatively represent around 10,400 hours of RKA services in one year provided by employees of the recordkeeper. There are no special or different RKA services provided to any plan with between, e.g., 13,000 and 17,000 participants, that would reasonably warrant incremental additional fees of around $520,000.

120.    The fact that the Plan has slightly fewer participants than the Assurant plan does not make the Assurant plan a meaningless comparable plan. On the contrary, the Assurant plan is a meaningful comparable plan because, in terms of the number of participants and in relation to the Plan, the

Assurant plan is one of the closest 0.1% of all defined contribution plans governed by ERISA. Plaintiffs do not contend the Plan should have necessarily been able to obtain a fee as low as the Assurant plan because the Assurant plan has more participants. Rather, the massive disparity between the Bundled RKA fees paid by the Assurant plan and the Plan's actual Bundled RKA fee rate of around $72/pp, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a reasonable inference that the Plan paid excessive and unreasonable RKA fees and the Plan's process was not prudent.

121.  **Team Health 401(k)** ("Team Health"): The comparable fee rate of $25/pp is taken directly from the "Plan Administrative Fees" section of the September 2020 Team Health 401(k) Plan participant fee disclosure document describing "Trust, Custody, and recordkeeping fees are $25.00 per participant."

122.  The Team Health plan is a meaningful benchmark because at the end of 2020 it had 17,237 participants, which is within 26% of the 13,715 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than around 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Team Health plan and the Plan, and any service differentials cannot explain the disparity between the fee rates paid by the Team Health plan and the fees actually paid by the Plan. There are no material differences in the RKA services provided to plans as large as both the Team Health plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Team Health plan and the fees actually paid by the Plan.

123.  For example, the disparity of $47/pp between the Bundled RKA rate of $72/pp paid by the Plan compared to $25/pp bundled RKA rate of the Team Health plan's fee represents around $640,000 annually and would conservatively represent around 12,800 hours of RKA services in one year provided by employees of the recordkeeper.  There are no special or different RKA services

provided to any plan with between, e.g., 13,000 and just over 17,000 participants, that would reasonably warrant incremental additional fees of around $640,000.

124.    The fact that the Plan has slightly fewer participants than the Team Health plan does not make the Team Health plan a meaningless comparable plan.  On the contrary, the Team Health plan is a meaningful comparable plan because, in terms of the number of participants and in relation to the Plan, the Team Health plan is one of the closest 0.1% of all defined contribution plans governed by ERISA. Plaintiffs do not contend the Plan should have necessarily been able to obtain a fee as low as the Team Health plan because the Team Health plan has more participants. Rather, the massive disparity between the Bundled RKA fees paid by the Team Health plan and the Plan's actual Bundled RKA fee rate of around $72/pp, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a reasonable inference that the Plan paid excessive and unreasonable RKA fees and the Plan's process was not prudent.

125.    Viewing all the data points provided by the comparable plan set forth above holistically and in the full context of how the retirement plan industry operates, provides sufficient evidence to support a plausible inference that the Plan paid unreasonable and excessive fees for Bundled RKA services.

126.    Each of these comparator plans note in their fee disclosures and other Plan documents that they received Bundled RKA services materially similar to the TDS Plan in the form of record-keeping, trustee, accounting, and other administrative fees.

127.    Although some of the comparators utilize different service or compensation codes for the services received on the 5500 Form, because Bundled RKA fees for massive plans like the TDS Plan are fungible and commoditized, any differences between the plans in these codes are immaterial from a pricing perspective.

128.    The graph below illustrates the annual Bundled RKA fees paid by other comparable

plans of similar sizes, receiving a materially similar level and quality of RKA services in 2021, compared

to the 2021 Bundled RKA fees paid by the TDS Plan, with the white data points representing Bundled

RKA fees that recordkeepers offered to (and were accepted by) comparable plans.



129.    The trend line (dashed white in the graph above) generated from these data points

represent a reasonable estimate of the fee rate that several recordkeepers, including Alight itself, serv-

ing the market for similarly-sized plans would be willing to accept in a competitive environment to

provide Bundled RKA services to the TDS Plan.

130.    The table and graph above illustrate that the Plan paid a Bundled RKA fee of $72 per

participant for 2021.

131.    A reasonable Bundled RKA fee for 2021 for the TDS Plan based on the services pro-

vided by existing recordkeepers based on the graph and charts above would have been $36 per par-

ticipant.

132.    The Bundled RKA fees paid by the Plan to Alight during the Class Period were excessive relative to the RKA services rendered given the commoditized and fungible nature of RKA fees for massive plans like the TDS Plan.

133.    From the years 2018 through 2022 and based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosure documents provided to participants in similarly sized plans, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $1,065,389 per year in Bundled RKA fees, which equated to an effective average of approximately $77 per participant per year.

134.    A hypothetical prudent plan fiduciary would not agree to pay *a 115% premium* for what they could otherwise pay for the materially similar level and quality of Bundled RKA services.

135.    From the years 2018 through 2022, and based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosures, the Plan additionally cost its participants on average approximately $568,826 per year in additional recordkeeping fees, which equates to on average approximately $41 per participant per year.

136.    From the years 2018 to 2022, and because Defendants did not act with prudence, and as compared to other plans of similar sizes and with a materially similar level and quality of services, the Plan actually cost its participants a Bundled minimum amount of approximately $2,844,132 in unreasonable and excessive Bundled RK&A fees.

137.    From the years 2018 to 2022, based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosures, because Defendants did not act prudently, and as compared to other Plans of similar sizes and with a materially similar level and quality of services, the Plan caused Plan participants to suffer losses (when accounting for compounding percentages/lost market investment opportunity) a Bundled cumulative amount in excess of $3,743,194 in Bundled RKA fees.

138.    Defendants failed to take advantage of the Plan's mammoth size to timely negotiate lower fees or rebates from its existing recordkeeper, Alight.

139.    Defendants could have obtained materially similar Bundled RKA services for much less from other recordkeepers or from Alight itself had it only leveraged its massive size.

140.    It can be plausibly inferred from the unreasonably high fees it paid for Bundled RKA services during the Class Period that Defendants did not conduct an effective or competitive solicitation of bids for Bundled RKA services, and failed to use the Plan's massive size to negotiate rebates from Alight.

141.    Plaintiffs and Class Members paid all of these excessive Bundled RKA fees in the form of direct and indirect compensation to the Plan and suffered injuries to their Plan accounts as a result.

142.    During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Bundled RKA fees than they should have been and/or by failing to take effective remedial actions, Defendants breached their fiduciary duty of prudence to Plaintiffs and to other Plan participants, causing millions of dollars of harm to Plaintiffs' and Class Member's retirement accounts.

## CLASS ACTION ALLEGATIONS

143.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

144.    In acting in this representative capacity, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seeks to certify, and to be appointed as representative of, the following Class:

> All participants and beneficiaries of the Telephone Data and Systems, Inc. Tax Deferred Savings Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning February 28, 2018, and running through the date of judgment.

145.     The Class includes approximately 15,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

146.     There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

   a.     Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

   b.     Whether Defendants breached their fiduciary duties of prudence and loyalty to the Plan;

   c.     What are the losses to the Plan resulting from each breach of fiduciary duty; and

   d.     What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of fiduciary duty.

147.     Plaintiffs' claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct in the same manner and under the same legal theories.

148.     Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they are participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

149.     Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the

Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

150.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

151.    Plaintiffs' attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

152.    The claims brought by the Plaintiffs arise from fiduciary breaches as to the Plan in its entirety and does not involve mismanagement of individual accounts.

153.    The claims asserted on behalf of the TDS Plan in this case fall outside the scope of any exhaustion language in the individual participants' Plan. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

154.    Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

155.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breach of Duty of Prudence Under ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class, Against**
**Defendants – Bundled RKA Fees)**

156.     Plaintiffs restate the above allegations as if fully set forth herein.

157.     Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

158.     29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in its administration of the Plan.

159.     Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges reasonable Bundled RKA fees.

160.     During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's Bundled RKA fees were reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

161.     During the Class Period, Defendants breached its fiduciary duty of prudence to Plan participants, including to Plaintiffs, by failing to: ensure that the Plan's Bundled RKA fees were reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

162.     During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper, Alight, to make sure it was providing the Bundled RKA services at reasonable cost, given the highly competitive, commodified and fungible market surrounding recordkeeping and the enormous bargaining power the Plan had to negotiate the best fees, and remove Alight if it provided RKA services at objectively unreasonable fee levels.

163.     During the Class Period, Defendants breached their duty to Plan participants, including to Plaintiffs, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

164.    Defendants failed to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

165.    As a result of Defendants' breach of their fiduciary duties of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered millions of dollars in unreasonable and unnecessary monetary losses.

166.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the TDS Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

### SECOND CLAIM FOR RELIEF
**Failure to Adequately Monitor Other**
**Fiduciaries under ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class, Against**
**Defendants – Bundled RKA Fees)**

167.    Plaintiffs restate the above allegations as if fully set forth herein.

168.    Defendants had the authority to appoint and remove members or individuals responsible for Plan Bundled RKA fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

169.    In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan Bundled RKA fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

170.    Defendants had a duty to ensure that the individuals responsible for Plan Bundled RKA fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's Bundled RKA fees; and reported regularly to Defendants.

171.    The unreasonable Bundled RKA fees paid by the Plan inferentially establish that Defendants breached their duty to monitor by, among other things:

a.    Failing to monitor and evaluate the performance of individuals responsible for Plan Bundled RKA fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonable Bundled RKA expenses;

b.    Failing to monitor the process by which the Plan's recordkeeper, Alight, was evaluated, and failing to investigate the availability of more reasonably-priced recordkeepers; and

c.    Failing to remove individuals responsible for Plan Bundled RKA fees whose performance was inadequate in that these individuals continued to pay the same Bundled RKA fees over numerous years even though solicitation of competitive bids would have shown that maintaining Alight as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plaintiffs' and other Plan participants' retirement savings.

172.    As the consequences of the breaches of the duty to monitor Bundled RKA fees, the Plaintiffs and Plan participants suffered millions of dollars of objectively unreasonable monetary losses.

173.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the TDS Plan all losses caused by their failure to adequately monitor individuals responsible for Plan Bundled RKA fees. In addition, Plaintiffs and the Class are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.  A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.  Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.  A Declaration the Defendants are fiduciaries, have breached their fiduciary duty of prudence under ERISA, causing harm to Plan participants and beneficiaries;

D.  An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable Bundled RKA fees, and restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.  An Order requiring TDS to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against TDS as necessary to effectuate relief, and to prevent TDS' unjust enrichment;

F.  An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.  Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.  An award of pre-judgment interest;

I.  An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.  Such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Date: February 28, 2024,                    **NEWKIRK ZWAGERMAN, P.L.C.**

*/s/ Jill Zwagerman*
Jill M. Zwagerman
3900 Ingersoll Ave., Suite 201
Des Moines, IA 50312
Telephone: (515) 883-2000
E-Mail: jzwagerman@newkirklaw.com

**WALCHESKE & LUZI, LLC**

Paul M. Secunda*
*Pro Hac Vice Motion Pending*
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (414) 828-2372
Fax: (262) 565-6469
psecunda@walcheskeluzi.com

*Attorneys for Plaintiffs and Proposed Class*